**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsbergslaw.com

*Counsel for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNIFER SAGER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CETERA FINANCIAL GROUP, INC., and CETERA INVESTMENT SERVICES LLC,<br><br>Defendants. | Case No. 3:26-cv-03372-RSH-VET<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Jennifer Sager ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this action against Cetera Financial Group, Inc. ("Cetera Financial"), and Cetera Investment Services LLC ("CIS") (collectively, "Cetera" or "Defendants"). Plaintiff alleges the following upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including review and analysis of: (a) documents created and distributed by Defendant; (b) account statements, disclosures, and agreements provided to Plaintiff and similarly situated customers; and (c) publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. This case arises from Defendants' exploitative implementation of their FDIC-Insured FlexInsured Sweep Account Program (the "Program"), resulting in the breach of Defendants' contractual obligations owed to Plaintiff and similarly situated investors.

2. While acting as their customers' agents, Defendants automatically "swept" uninvested cash balances in their customer accounts into interest-bearing deposit accounts at participating program banks ("Program Banks") selected by Defendants. Because the Program Banks paid far below-market rates of interest, Plaintiff and Class members lost significant interest they would have otherwise earned had Defendants swept their cash into accounts or vehicles paying reasonable market rates, or raised the rates paid to customers through the Program as federal interest rates began to rise in 2022.

3. Cetera's FlexInsured Account Disclosure Statement, incorporated into the parties' contract, provides that the interest rate that customers may earn will be established by CIS based on market, economic, and other business conditions.[1] In breach of the parties' contract, the rates that customers enrolled in Cetera's Program earned remained stagnant and bore no reasonable relation to any prevailing market, economic, and other business conditions.

4. Indeed, during the rising interest rate environment from March 2022 through the present, the profits that Defendants have earned on their customers' cash have grown exponentially. Rising interest rates should have presented an opportunity for Defendants' customers to earn more on

---

[1] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023). https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed September 28, 2026)

their uninvested cash. However, Defendants continue to exploit this opportunity for their own benefit, extracting the high rates of interest for themselves and thwarting their customers from receiving the reasonable returns they were legally entitled to. Defendants disguise the returns they keep as "fees" for administering the Program. However, in reality, they receive kickbacks from the Program Banks on the profits they are able to obtain by investing or loaning out customers' cash at significantly higher rates of interest. By improperly keeping the interest rates paid on the cash sweep accounts low and sharing the interest profit with the Program Banks, Defendants align themselves with the banks to maximize their own profits, rather than the customers to which they owe contractual duties.

5. This is not accidental: Defendants' own disclosures acknowledged that the Program was a source of substantial revenue and created conflicts of interest. Specifically, Defendants represent that "Cetera earns substantial fees from Program Banks based on your participation, and the fee will be significantly higher to Cetera than if your funds were swept into a money market mutual fund or deposited into another product or depository institution . . . The compensation that Cetera receives presents a conflict of interest, because Cetera receives a greater financial benefit when cash is swept into the FlexInsured Account than it otherwise would if your cash balance is held in a money market mutual fund or other products, and the fees that Cetera receives reduces the amount of interest you receive in the FlexInsured Account."[2]

6. Defendants failed to disclose the magnitude of the rate differential, the specific rates paid by the Program Banks, the specific amounts Defendants retained as compensation, or the true extent to which the Program enriched Defendants at their customers' expense.

7. Defendants' own disclosures also acknowledged that "rates of interest paid with respect to FlexInsured Accounts will generally be lower than the rate of return from a money market

[2] *Id.*

mutual fund."[3] Yet Defendants designated their FDIC-Insured Program—not the higher-yielding money market fund alternative—as the default sweep option for eligible accounts, because, as Defendants admitted, they stood to earn more on the Program.[4]

8. While Cetera paid customers small amounts of interest, between 2023 and 2025, it earned over 3% in fees.[5]

9. The SEC has specifically recognized that a "cash sweep program" is a "common source[] of conflicts of interest."[6] Despite this regulatory warning, Defendants exploited their discretion over the Program to maximize their own financial benefits at the direct expense of their customers.

10. The Program was highly lucrative for Defendants. During the Class Period, the "spread" between the minuscule rates passed along to customers and the returns Defendants and the Program Banks earned from customer cash constituted a substantial and undisclosed profit center for Defendant.

11. Comparable brokerages paid substantially higher rates on swept cash. For example, Fidelity swept customers' cash into a money market mutual fund yielding over 3.30%, Vanguard offered yields of 3.04% to 3.62%, and R.W. Baird offered approximately 3.54%. By contrast, Defendants paid a tiny fraction of these market rates.

---

[3] *Id.*

[4] *Id.*

[5] https://cetera.com/cetera-wealth-services/flexInsured-account-fees

[6] https://www.sec.gov/about/divisions-offices/division-trading-markets/broker-dealers/staff-bulletin-standards-conduct-broker-dealers-investment-advisers-conflicts-interest (last accessed September 28, 2026).

12. Other metrics—including the federal funds rate, Treasury bill yields, and money market fund returns—further evidence that Defendants' sweep rates were not reasonable.

13. Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, violation of applicable state consumer protection statutes, and unjust enrichment, to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## PARTIES

14. At all times material hereto, Plaintiff Jennifer Sager has been a resident and citizen of the State of Illinois. Plaintiff maintained a brokerage account with CIS. While Plaintiff was Defendants' customer, the cash held in her account was automatically "swept" into the FlexInsured Account, a low interest-bearing sweep deposit account at a Program Bank pursuant to the Program.

15. Defendant Cetera Financial Group, Inc. is a Delaware corporation and the parent company and control person of Cetera Advisor Networks. Cetera Financial is headquartered in San Diego, California. Cetera Financial had ultimate authority over, and direct financial benefit from, the Program. Through its network of independent broker-dealers and investment advisers, Cetera Financial controls the policies and practices at issue.

16. Defendant Cetera Investment Services LLC is a broker-dealer. CIS offers brokerage to customers, including the administration and operation of the Program at issue.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) minimal diversity exists between at

least one plaintiff or class member and one defendant.

18. This Court has personal jurisdiction over Defendants because they regularly conduct business and activities in this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

19. Venue is proper in this District under 28 U.S.C. §1391 because Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District, including Defendants' unlawful actions.

## FACTUAL BACKGROUND

### A. Defendants' Customer Relationship

20. Plaintiff and each Class member entered into an Account Agreement (the "Account Agreement") with Cetera in connection with the opening and maintenance of their brokerage accounts with Defendants. The Account Agreement outlines the contractual terms and conditions of Plaintiff's relationship with Defendants and applies to all of Plaintiff's accounts with Defendant.

21. Upon information and belief, the Account Agreement provides, in substance and in relevant part, that by signing the Account Agreement, the accountholder agrees to the terms of the Account Agreement and any additional terms, agreements, or account disclosures that Defendants may provide.

22. The Account Agreement further references and incorporates the terms and conditions of Defendants' Cash Sweep Program, including the FlexInsured Account Disclosure Statement, Exhibit 1, and CIS's Form CRS (collectively, the "Contract").[7]

---

[7] The Account Agreement and Contract disclosures, together with all amendments and successive versions thereof, are standard-form documents that, upon information and belief, Defendants drafted, maintained, and distributed to each of its accountholders as part of its ordinary course of business. Defendant is in the best position to produce these documents, which may be obtained through discovery.

23. By entering a contractual brokerage relationship with Plaintiff and the putative Class, Cetera assumed duties including the duties of good faith and fair dealing.

24. Defendants' duties are further described in Regulation Best Interest ("Reg. BI") under the Securities Exchange Act of 1934, which requires broker-dealers to act in retail customers' best interests, meeting obligations of disclosure, care, conflicts of interest, and compliance.

25. Despite these proclamations, Defendants failed to adhere to this standard throughout the relevant Class Period.

**B. The Cash Sweep Program**

26. A "sweep program" is a "service provided by a broker-dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation.“ *See* 17 CFR 240.15c3-3(a)(17).

27. Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the Net Interest Margin ("NIM").

28. The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers: Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest."[8]

29. Under Defendants' primary sweep program, the FlexInsured Account Program, upon information and belief, Defendants automatically swept clients' available cash balances—including

---

[8] *See* n.5.

proceeds from securities sales, dividends, bond interest, and cash deposits—into interest-bearing deposit accounts at participating Program Banks.

30. The FlexInsured Account was the default sweep vehicle for most brokerage accounts and non-retirement advisory accounts. Defendants chose this sweep vehicle over higher-yielding money market fund alternatives because, as they admitted, "[t]he Firm will earn more money by designating the FlexInsured Account . . . as the default sweep option for eligible accounts."

31. Moreover, Defendants admit that Cetera "has a financial incentive and conflict of interest in selecting cash sweep options."

32. The Program primarily benefited Defendants at the expense of their customers. Through their operation of the Program, Defendants engaged in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

### C. Defendants Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts in breach of their contract with Plaintiff.

33. Defendants breached their contractual duties by failing to pay interest rates based on market, economic, and other business conditions for their customers' uninvested cash in operating the Program.

34. Plaintiff Sager and CIS entered into the Contract governing Plaintiff's account via the Account Agreement. Pursuant to the Contract, Defendants had a contractual obligation to Plaintiff to pay them interest rates based on market, economic, and other business conditions. Cetera's FlexInsured Account Disclosure Statement provides:

> The interest rate available through the FlexInsured Account will be established periodically by Cetera Investment Services ***based on market, economic, and other business conditions.***[9] (emphasis added).

---

[9] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023). https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed September 15, 2026)

35. Cetera breached this contractual obligation by paying customers rates that are unreasonably low relative to federal benchmark rates.

36. This was intentionally self-serving. Indeed, Cetera breached its contractual obligations to customers to pay more fees to itself at the expense of its customers:

> Cetera is responsible for setting the fees which ultimately reduces the interest rates available on FlexInsured Account deposits. Our Cash Sweep Governance Committee meets periodically to review the rates paid to customers who participate in the FlexInsured Account program based on a number of factors including the rates paid by Program Banks, interest rates paid by our competitors who offer similar insured deposit program, any expected changes in rates, and FlexInsured Account program expenses.[10]

37. At their customers' agent and broker, Defendants were contractually and legally obligated to act in the best interest of their clients. Defendants' practice of extracting excessive fees from their customers' cash sweep deposits through the negotiation of unreasonably low interest rates was against their customers' interests.

38. Defendants did not pay rates of interest based on market, economic, and other business conditions for their customers' cash sweep deposits, but instead, upon information and belief, worked in consultation with their affiliated banks to set artificially and unreasonably low interest rates for deposit accounts in the Program.

39. This is not by accident. The greater the amount of cash balances maintained under the Program, and the lower the rates of interest paid on these cash balances, the more Defendants benefit. Upon information and belief, based on these adverse incentives, Defendants limited customers to below-market and unreasonably low interest rates and retained unreasonably high fees for themselves.

[10] *Id.*

40. When interest rates rose in 2022, Defendants failed to take that into account when setting customer sweep rates.

41. Three-month Treasury bills, rose in yield from 0.046% as of January 1, 2022, to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates.

42. Federal benchmark interest rates, including the federal funds rate, are an appropriate point of comparison for the reasonableness of Defendants' interest rates. The federal funds rate is the rate banks charge to borrow from each other overnight. As the Board of Governors of the U.S. Federal Reserve System ("Federal Reserve") explains on its website, "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."

43. The effective federal funds rate rose from a low of nearly zero to a 20-year high of approximately 5.33%, based on the Federal Reserve increasing the target range to 5.25% to 5.50%. For example, between March 16, 2022, and July 26, 2023 alone, the Federal Reserve announced 11 hikes to the federal funds rate, increasing it from a target range of 0.00% to 0.25% to a target range of 5.25% to 5.50%.[11] This was a fundamental change to market, economic, and other business conditions. Despite promising to consider such changes when setting the rates paid to customers under their sweep Program, Defendants failed to increase the amounts paid to customers and instead just pocketed more money.

44. Defendants have failed to pass through to their customers the increases in the FFR since at least early 2022. Between March 2022 and July 2023, the Federal Reserve increased the FFR target range eleven times. As a result, the FFR rose from approximately 1.58% (June 2022) to over

---

[11] Federal Reserve, *Economy at a Glance – Policy Rate* (Jan. 30, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

5.25% (June 2023 through mid-2024). In contrast, the rates paid under the Program changed minimally—far below any market benchmark. The rates paid under the Program consistently have been and remain unreasonably low and uncompetitive relative to FFRs, even during the ultra-low-interest rate environment resulting from the COVID-19 pandemic (early 2020 through early 2022).

45. In addition to the federal funds rate, the rates paid under the Sweep Program have been and remain ***significantly*** below several other objective benchmarks of reasonableness, including, by way of example: (a) U.S. Treasury bill rates; (b) the overnight interest rate at which the Federal Reserve repurchases securities from private banks (*i.e.*, the "repo" rate); and (c) the Secured Overnight Financing Rate ("SOFR"). Short-term interest rates for these other federal financial instruments experienced steep rate increases in 2022 and 2023, as the Federal Reserve hiked the federal funds rate.

46. For purposes of illustration, the following charts depict the one-year and three-month Treasury bill rates between 2017 and 2026:






47. The repo rate similarly increased together with the federal funds rate beginning in 2022. For purposes of illustration, the following graph depicts the repo rates between 2017 and 2026:




48. As depicted above, like other short-term interest rate benchmarks, the repo rate increased alongside the federal funds rate beginning in 2022.

49. In addition, the rates paid under the Program consistently have been and remain unreasonably low and uncompetitive relative to the SOFR.

50. The SOFR measures the cost of borrowing cash overnight collateralized by Treasury securities and is calculated from a very large volume of actual repurchase transactions.[12] It is widely regarded as the best measure of the marginal cost of secured overnight funding in U.S. dollar markets. Importantly, the SOFR is a market rate that Federal Reserve publications emphasize is the most representative measure of short-term funding conditions precisely because it is grounded in actual trades, rather than quotes or estimates.[13]

51. Moreover, the sharp increases in the effective FFR and the SOFR beginning in 2022 and continuing through the present produced little to no increase in the rates paid under the Program. Indeed, the rates paid by Defendants remained far below market, even while short-term interest rate conditions improved drastically during the relevant time period. In addition to the FFR discussed above, the rates paid under the Program have been and remain significantly below several other objective *indicia* of reasonableness, including, by way of example: (a) SOFRs, including the 180-day average SOFR currently at 3.66%,[14] as of September 16, 2026; (b) Treasury bill rates, including the

---

[12] Federal Reserve Bank of New York, *Secured Overnight Financing Rate*, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited September 28, 2026).

[13] Federal Reserve Bank of New York, *An Updated User's Guide to SOFR* (Feb. 2021), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf.

[14] SOFR Academy, *Market Data*, https://sofracademy.com/current-sofr-rates/ (last visited September 28, 2026).

three-month and one-year rates currently at 3.97% and 4.16%, respectively, as of September 16, 2026[15]; and (c) the overnight repo rate, which is currently 3.50%, as of September 16, 2026.[16]

52. The sweep rates of some competitors were far greater than the paltry sums paid under Defendants' Program. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program and Fidelity offered 5%.

53. At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). ***By contrast, Defendants have been paying interest rates as low as 0.06%***—virtually nothing.

54. The federal funds target rate continued to increase in 2023, hitting an effective yield of 5.33% on July 27, 2023. As the federal funds rate increased, so too did Vanguard and Fidelity continue to increase the rates they paid on swept cash. Defendant, by contrast, continued to pay close to no interest.

55. While every cash sweep program is unique, the disparity in yield between the Program and those of Defendants' competitors illustrates that Defendants operated the Program to serve their own interests rather than the interests of their customers. For example, Fidelity's FDIC-Insured Deposit Sweep Program currently pays an interest rate of 1.82% and Vanguard's FDIC-insured Cash Deposit Program currently pays an annual percentage yield of 1.75%.

---

[15] Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (September 16, 2026), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (September 16, 2026), https://fred.stlouisfed.org/series/DTB1YR.

[16] Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate* (July 30, 2026), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

56. Competitor sweep programs are governed by different contractual arrangements and business structures, many of which may also involve structural, rate-depressing conflicts of interest. Nevertheless, sweep rates offered by other financial institutions highlight the uncompetitiveness and unreasonableness of Defendants' Program, and demonstrate that Defendants stands out among the worst in an already uncompetitive industry.

57. Fidelity also offers to automatically sweep customers' cash into a money market mutual fund with a current seven-day yield of 3.33%, as of August 31, 2026.[17] Vanguard offers to automatically sweep customers' cash into one of five money market mutual funds with current seven-day yields ranging from 2.59% to 3.71%.

58. Like Fidelity and Vanguard, Defendants could have automatically swept cash to banks that pay market rates, or allowed all customers to sweep to a money market mutual fund. Money market mutual funds are strictly regulated by the SEC and can only be sold pursuant to prospectuses, which disclose the sponsor's profits on the use of investor cash. By contrast, Defendants' Program does not disclose the significant spread between the rates paid on cash and the FFR or rates paid by other competitors.

59. Through any reasonable means of interpretation and construction, Defendants failed to pay any reasonable rate to their customers through the Program.

60. Cetera's interest rates are significantly lower than its competitors', but they are also substantially lower than interest rates for money market funds. Nevertheless, Cetera automatically places customers into the cash sweep program developed with low yield rates that they negotiated with partner banks.

[17]

**D. Cetera maximized its profits from cash sweep program by systematically prohibiting its financial professionals from offering customers higher-yield alternative to the Program.**

61. Defendants had alternatives for cash management, including other sweep vehicles, that would have paid customers a competitive market rate of interest. For example, one of those potential alternative vehicles would have been enrollment into higher-yielding money market funds.

62. Defendants explicitly admit that "[y]ou may receive a lower rate of return on funds deposited through the FlexInsured Account than other types of money market investments such as money market funds."[18]

63. Yet, despite acknowledging that rates paid under the Program were lower than rates that may be available through money market funds, Defendants consciously steered Plaintiff and similarly situated investors into the lower-yielding Program for their own financial benefit. As Defendants explained:

> Cetera Investment Services earns substantial fees from Program Banks based on your participation in the FlexInsured Account program, and this fee will be significantly higher to Cetera Investment Services than if your funds were swept tointo (sic) a money market mutual fund or deposited in another product or depository institution . . . This compensation that Cetera Investment Services receives presents a conflict of interest to Cetera Investment Services because Cetera Investment Services receives a greater financial benefit when cash is swept into the FlexInsured Account than it otherwise would if your cash is held in a money market fund or other products . . . Cetera Investment Services therefore has an incentive for your funds to be swept into the FlexInsured Account program rather than a money market mutual funds or other alternative to the FlexInsured Account.[19]

---

[18] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023). https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed September 15, 2026)

[19] *Id.*

64. Although Defendants disclosed this financial incentive, they did not disclose that their policies and practices restricted financial professionals from offering money market funds to customers as an alternative to the Program.

65. Indeed, Defendants represented that "[i]f you elect not to utilize the FlexInsured Account as the sweep option on your account, your Financial Professional can tell you about certain money market funds or other products available through Cetera Investment Services that you may wish to consider as alternative to maintaining cash deposits on your account."[20] Yet, upon information and belief, Defendants maintained a policy that restricted their financial professionals[21] from offering money market funds to customers as an alternative to the cash sweep program.

66. Instead, the only actual alternative to the Program that Defendants disclosed was leaving cash in the brokerage account, where it earned no interest at all.[22]

67. Upon information and belief, the "alternative" Defendants touted was therefore illusory. By representing that money market funds were available through their financial professionals while prohibiting those same professionals from offering them, Defendants left customers with only two options: the Program's below-market rates or no interest at all. This served Defendants' financial interests at their customers' expense. In this way, Defendants ensured that customer cash remained captive in the Program, where it generated substantial profits for Defendants. This was far more

---

[20] *Id.*

[21] This term includes both registered representatives providing broker-dealer services and investment adviser representatives providing fee-based advisory services.

[22] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023). https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed September 15, 2026) at 3.

beneficial to Defendants than the alternative of having that cash swept to higher-yielding alternatives that would have benefited customers while earning Defendants little or nothing.

68. Accordingly, Defendants' conduct breached the covenant of good faith and fair dealing implied in their agreements with Plaintiff and the Class. To the extent those agreements afforded Defendants discretion over the sweep options made available to customers, Defendants were obligated to exercise that discretion in good faith and consistent with customers' reasonable expectations. Instead, Defendants exercised it to enrich themselves, holding out alternatives that their own policy foreclosed and thereby depriving Plaintiff and the Class of the benefit of their bargain.

**E. Cetera Financial's Control Over and Participation in the Program**

69. Upon information and belief, Cetera Financial directly participated in and exercised control or oversight over material aspects of the Program.

70. CIS is, and at all relevant times was, a wholly owned subsidiary of Cetera Financial. Cetera Financial owns all equity interests in CIS, and CIS has no shareholders or equity owners independent of Cetera Financial. CIS's own financial materials describe CIS as a "wholly owned subsidiary of Cetera Financial Group, Inc."[23]

71. CIS's FINRA BrokerCheck report likewise identifies Cetera Financial as its "SOLE MEMBER," with an ownership percentage of "75% or more." More distinctly, CIS expressly states "yes" to FINRA's question whether Cetera Financial "directs the management or policies" of CIS.[24] This same filing also reflects that Cetera Financial's c-suite officers hold officer positions at CIS. *Id.*

---

[23] https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30144889 (last visited September 28, 2026).

[24] https://files.brokercheck.finra.org/firm/firm_15340.pdf (last visited September 20, 2026).

72. Cetera Financial's connection to the Program extends beyond its ownership of CIS. Cetera Financial is also the registered owner of the federal trademark for "FLEXINSURED ACCOUNT," the name under which the Program is offered.[25]

73. CIS's SEC-filed audited financial statements further reflect an ongoing operational and financial relationship between CIS and Cetera Financial. Among other things, CIS discloses that Cetera Financial allocates a portion of its general administrative expenses to CIS based on factors including CIS's total revenues, assets under management, sales volume, number of personnel, and producing advisors.[26] Thus, Cetera Financial is not merely a passive shareholder of CIS.

74. Upon information and belief, material aspects of the Program—including the methodology for determining customer rates, bank economics, revenue allocation, and customer disclosures—were established, approved, ratified, and/or overseen by Cetera Financial, including through individuals who held positions at both Cetera Financial and CIS.

75. Upon information and belief, in implementing and administering the Program, CIS acted, at least in part, pursuant to the direction, approval, or oversight of Cetera Financial and acted as Cetera Financial's agent with respect to the conduct alleged herein.

76. Accordingly, Cetera Financial is liable for its own participation in and control over the conduct alleged herein and, to the extent CIS acted as its agent, for CIS's conduct within the scope of that agency.

---

[25] https://trademarks.justia.com/775/32/flexinsured-77532815.html (last visited September 20, 2026).

[26] https://www.sec.gov/Archives/edgar/data/718856/000071885626000005/cwspub.pdf (last visited September 20, 2026).

77. Upon information and belief, Cetera Financial also failed to exercise reasonable care in its oversight of the Program, including with respect to rate governance, conflicts, customer disclosures, and supervisory review.

## CLASS ALLEGATIONS

78. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of herself and all others similarly situated defined as follows:

79. **The Class** is defined as follows:

> All Cetera customers who had cash deposits or balances in Cetera's sweep Program during the applicable limitations period.

80. Plaintiff also brings this action on behalf of the following Illinois Subclass:

81. **The Illinois Subclass** is defined as follows:

> All Cetera customers who reside in Illinois who had cash deposits or balances in Cetera's sweep Program during the applicable limitations period.

82. Unless otherwise specified, all references herein to the "Class" shall include both the Class and the Illinois Subclass. Plaintiff reserves the right to modify, expand, or otherwise amend the Class and Subclass definitions, including by adding or removing subclasses, as discovery and further investigation may warrant and as may be appropriate or permitted under Fed. R. Civ. P. 23.

83. **Numerosity.** Upon information and belief, there are thousands of Class members, so joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands and are geographically dispersed because Defendants oversee billions in client assets worldwide.

84. **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a) whether Defendants breached their contract with Plaintiff and the putative Class members regarding the Program, including the implied covenant of good faith and fair dealing;

(b) whether Defendants made material misrepresentations and/or omissions in connection with the Program;

(c) whether Defendants have been unjustly enriched because of the conduct complained of herein;

(d) whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

(e) to what extent Class members are entitled to damages and other monetary relief; and

(f) to what extent Class members are entitled to attorneys' fees and costs.

85. **Typicality**. Plaintiff's claims are typical of the claims of the Class because she was a customer of Defendants that had her cash balances improperly managed by Defendants through their administration of the Program. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class is common to the members of each.

86. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

87. **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal

litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

88. **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(On behalf of Plaintiff and the Class)**

89. Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–88 by reference as if fully set forth herein.

90. Plaintiff's and Class members' relationship with CIS is governed by the Contract, the terms of which are contained in, and incorporated into, various standardized documents drafted by CIS, including the Account Agreement and the FlexInsured Program Disclosures. As alleged above, Cetera Financial owns and controls CIS and, upon information and belief, participated in and exercised control or oversight over material aspects of the Program giving rise to the breaches alleged herein.

91. Contrary to the Contract, the interest rates paid under the Program were not established based on market, economic, and other business conditions, did not vary reasonably with prevailing market rates, and were not reasonable. Instead, Defendants maintained rates far below prevailing market rates even as short-term interest rates increased substantially, thereby increasing the compensation Defendants earned from the Program at their customers' expense.

92. The Contract included the following contractual terms, among others: interest rates on the deposit accounts will be established periodically by CIS based on market, economic, and other business conditions; and that Defendants are responsible for setting the fees which ultimately reduce the interest rates available on the deposit accounts.

93. Moreover, Defendants failed to extract market-based, reasonable fees from the Program. Because the Program was to be a market-based investment that utilized customer cash, and customer returns were to be dictated by participating Program Banks and the prevailing short-term, market interest rate environment, the fees taken from that amount were required to be market-based and reasonable, reflecting the true value of the intermediary services Defendants actually performed, not their own economic interests.

94. Plaintiff and Class members fulfilled all the terms and obligations of their contracts, including paying commissions and fees for Defendants' services.

95. Defendants undertook acting as agents of the customers regarding all transactions relating to the Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their clients' best interests.

96. As set forth herein, the rates of return paid to customers on their cash balances were not reasonable and Defendants did not act in their clients' best interests. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

97. Defendants breached their contractual obligations as described herein by, among other things: (a) failing to provide Plaintiff and the Class with reasonable, market-based interest rates on their deposits in the Program; (b) failing to adjust the interest rates paid to customers based on market, economic, and other business conditions when federal interest rates began to rise in 2022; and (c) extracting unreasonable fees from the interest accrued on the deposit accounts that were not based on

the market value of the intermediary services they provided. Indeed, the sweep interest rates provided by Defendants were unreasonably low and well below several objective benchmarks including the FFR, which increased dramatically during the relevant time period while the interest rates paid to customers in the Program lagged far behind and remained well below market. As such, Defendants denied Plaintiff and the Class the full benefit of their bargain under the Program Disclosures.

98. Plaintiff and the members of the proposed Class suffered monetary damages because of Defendants' breach of contract.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiff and the Class)**

99. Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–88 by reference as if fully set forth herein.

100. A covenant of good faith and fair dealing is implied into every contract.

101. Plaintiff and Class members contracted with CIS to provide them with brokerage services pursuant to the agreements and related disclosures. As alleged above, Cetera Financial owns and controls CIS and, upon information and belief, participated in and exercised control or oversight over the material aspects of the Program challenged herein, including CIS's exercise of discretion concerning the Program.

102. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties, both explicit and implied, and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.

103. Defendants both operated the Program in bad faith and in a manner that evaded the spirit of the Program and denied Plaintiff and the Class the expected benefit of their bargain.

104. Among other things, Defendants used their discretion over the Program—including

discretion over the selection of Program Banks, the placement of customer cash, the sweep rates, and the fees retained by Defendants—to credit customers unreasonably low, stagnant sweep interest rates while retaining, diverting, or allocating to themselves unreasonable portions of the economic value generated by customers' cash. Those credited rates were far below objective benchmarks, including the federal funds rate, Treasury and repo rates, competitor sweep rates, and money market fund yields, even as those benchmarks rose dramatically. CIS failed to move sweep rates upward during the period from approximately March 2022 through the present, during which the Federal Funds Rate rose from near-zero to as high as 5.33% — a period in which virtually every other interest-bearing product available to retail customers increased materially in yield.

105. By operating the Program in this manner, Defendants acted opportunistically and in bad faith, frustrated customers' reasonable expectations, and deprived customers of the principal benefit of the Program and the full benefit of their bargain. Plaintiff and the Class reasonably expected to earn interest on uninvested cash pending deployment into investments, but CIS's arbitrary rate-setting made this purpose illusory by diverting virtually all interest income to itself.

106. Defendants further breached the implied covenant through its handling of alternatives to the Program. Although the Program Disclosures represented that customers could learn from their Financial Professionals about available money market funds and other products, CIS maintained a policy prohibiting its Financial Professionals from offering money market funds as an alternative to the Program.

107. By holding out an alternative that its own policy foreclosed, Defendants exercised their discretion over available sweep options to keep customer cash in the Program and maximize the fees it received from Program Banks. This conduct frustrated Plaintiff's and Class members' reasonable expectations and deprived them of the benefit of their bargain.

108. As such, Defendants acted in bad faith and for their own financial benefit rather than

for the purposes contemplated by the Program Disclosures. In doing so, Defendants denied Plaintiff and the Class the full benefit of their bargain under the Program Disclosures, and frustrated their objectively reasonable contractual expectations.

109. Defendants exercised their contractual discretion to maintain artificially low and below-market sweep rates while retaining the substantial economic value generated by customer cash, even as short-term, market interest rates and comparable cash sweep programs increased significantly.

110. No rational business rationale — other than diverting maximum interest income from customers to Defendants — explains the decision to maintain near-zero sweep rates during a rising rate environment, and that this decision was therefore arbitrary and in bad faith.

111. Plaintiff and Class members fulfilled all the terms and obligations of their contracts, including paying commissions and fees for Defendants' services.

112. As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION AND OMISSIONS
## (On behalf of Plaintiff and the Class)

113. Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–88 by reference as if fully set forth herein.

114. Defendants were the agents of customers enrolled in the Program, including Plaintiff and the Class.

115. Cetera Financial is directly liable for the misrepresentations and omissions alleged herein.

116. Defendants negligently made material misrepresentations and omissions concerning the Program, as detailed above. Among other things, the Program Disclosures stated that the interest

rate earned by clients "will generally be lower than interest rates available to depositors in interest-bearing accounts held directly at a Program Bank or other FDIC-insured depository institutions," without disclosing the magnitude of the differential or the specific compensation retained by Defendants.

117. In reality, contrary to Defendants' misrepresentations and omissions, Defendants unilaterally decided to pay below-market, unreasonably low interest rates to customers, which remained stagnant despite a dramatically rising interest rate environment, and to extract unreasonably high compensation for themselves. Additionally, Program Disclosures failed to disclose the specific rates the Program Banks were paying, the proportion of such payments that Defendants were retaining as fees, or the extent to which Defendants were profiting from the Program.

118. Defendants further represented that, if a customer elected not to use the FlexInsured Account, a Financial Professional would be able to inform them about alternative cash management options, including potentially higher-yielding money market funds. That statement was false when made: Defendants had adopted a blanket policy prohibiting their financial professionals from offering money market funds as an alternative to the Program. Defendants likewise omitted the existence of that policy, a fact material to any customer deciding whether to leave cash in the Program.

119. Defendants knew or should have known that the representation was false and the omission misleading, because Defendants both authored the Program Disclosures and issued the policy that contradicted them. Had Plaintiff and the Class known that money market funds were not in fact available to them through their Financial Professionals, they would have sought higher-yielding alternatives for their uninvested cash rather than leaving it in the Program.

120. Moreover, Cetera Financial knew or should have known that this representation was false because, upon information and belief, it adopted or approved the policy that contradicted it. Cetera Financial supplied this information to guide customers' decisions about their uninvested cash

and had a direct pecuniary interest in those decisions. It failed to exercise reasonable care, including through the oversight failures alleged herein.

121. Plaintiff and the Class justifiably relied on Defendants' misrepresentations and omissions and accordingly deposited and maintained cash balances in the Program to their detriment.

122. Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the Class.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**(On behalf of Plaintiff and the Illinois Subclass)**

123. Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1-88 by reference as if fully set forth herein.

124. The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "ICFA"), prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

125. Defendants' acts and practices with respect to the Program constitute unfair and deceptive acts and practices in the conduct of trade and commerce in violation of the ICFA.

126. Defendants' acts and practices with respect to the Program occurred in the course of trade or commerce within the meaning of the ICFA because the account agreements and Program Disclosures are standardized form documents offered on a nationwide basis to Defendants' brokerage clients, including Plaintiff and members of the Illinois Subclass.

127. Defendants' acts and practices with respect to the Program were materially deceptive because the Program Disclosures did not accurately reflect the way that Defendants operated the

Program or the full extent of the financial benefit Defendants derived at customers' expense.

128. In reality, Defendants unilaterally decided to pay below-market, unreasonably low interest rates to customers, which remained stagnant despite a dramatically rising interest rate environment, and extract unreasonably high compensation for themselves. Additionally, Defendants failed to disclose the specific rates the Program Banks were paying or the proportion of such payments that Defendants were retaining.

129. Defendants' acts and practices with respect to the Program were also unfair within the meaning of the ICFA because they (a) offend the public policy of the State of Illinois favoring honest dealing in financial services and the protection of retail investors; (b) are immoral, unethical, oppressive, and unscrupulous in that Defendants exploited their control over customer cash to enrich themselves at the direct expense of their customers; and (c) caused substantial injury to consumers that consumers themselves could not reasonably avoid, given that the Program was the default sweep vehicle and customers were not offered competing options at account opening.

130. Defendants intended that Plaintiff and members of the Illinois Subclass relied on Defendants' deceptive disclosures and omissions concerning the Program.

131. Defendants' acts and practices with respect to the Program caused Plaintiff and members of the Illinois Subclass to suffer actual damages, including the difference between the interest they received under the Program and the interest they would have received at reasonable market rates.

132. Defendants' acts and practices were further deceptive because the Program Disclosures represented that customers who declined the FlexInsured Account could obtain money market funds and other products through their Financial Professional, when Defendants had adopted a blanket policy prohibiting their financial professionals from offering money market funds as an alternative to the Program. Defendants thereby misrepresented, and concealed the true state of, the

alternatives available to Illinois consumers for their uninvested cash.

133. Defendants' concealment of that policy was material because it bore directly on whether Plaintiff and members of the Illinois Subclass would leave their cash in the Program or move it to a higher-yielding vehicle. Defendants intended that consumers rely on the false assurance that alternatives were available, and the practice was also unfair because it deprived consumers of any meaningful ability to avoid the Program's below-market rates while serving no purpose other than increasing the fees Defendants earned from Program Banks.

134. Accordingly, Plaintiff and members of the Illinois Subclass seek all available relief under the ICFA, including actual damages, punitive damages, attorneys' fees and costs pursuant to 815 ILCS 505/10a, and injunctive relief.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

135. Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–88 by reference as if fully set forth herein.

136. This cause of action is pled in the alternative to the extent it is determined there is no enforceable contract.

137. Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

138. Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased compensation and revenue that belonged to Plaintiff and Class members.

139. Defendants financially benefited from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments under the Program

while retaining substantial compensation for themselves. These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

140. Moreover, Cetera Financial received and retained a benefit at Plaintiff's and Class members' expense. Cetera Financial allocates its general administrative expenses to CIS based in part on CIS's revenues, including Program revenues generated from customer cash which funded Cetera Financial's own operations. Upon information and belief, Program revenues also flowed to Cetera Financial.

141. It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

142. Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and her counsel as class counsel;
2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;
3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;
4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;
5. Awarding pre- and post-judgment interest, as allowable by law;
6. For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7.

8. Declaratory and equitable relief, including restitution and disgorgement;

9. For public injunctive relief as the Court may deem proper; and

10. Awarding such further and other relief as the Court deems just, proper and equitable.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: September 28, 2026

Respectfully submitted,

By: *_/s/ Scott Edelsberg_*
**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar No. 330990)
Gabriel Mandler (*pro hac vice* forthcoming)
Omer Kremer (*pro hac vice* forthcoming)
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com
gabriel@edelsberglaw.com
omer@edelsberglaw.com

Jason T. Dennett (*pro hac vice*)
**MILBERG, PLLC**
1700 7th Avenue, Suite 2100
Seattle, WA 98101
Telephone: (516) 515-9124
jdennett@milberg.com

*Counsel for Plaintiff and the Proposed Class*