**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com

*Counsel for Plaintiffs and the Putative Class*
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNIFER SAGER and KEITH PETERSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CETERA FINANCIAL GROUP, INC., CETERA INVESTMENT SERVICES LLC, CETERA ADVISORS LLC and CETERA INVESTMENT ADVISERS LLC,<br><br>Defendants. | Case No. 3:26-cv-03372-RSH-VET<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Jennifer Sager ("Sager") and Keith Peterson ("Peterson") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, bring this action against Cetera Financial Group, Inc. ("Cetera Financial"), Cetera Investment Services LLC ("CIS"), Cetera Advisors LLC ("Cetera Advisors"), and Cetera Investment Advisers LLC ("CIA") (collectively, "Cetera" or "Defendants"). Plaintiffs allege the following upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, including review and analysis of: (a) documents created and distributed by Defendants; (b) account statements, disclosures, and agreements provided to Plaintiffs and similarly situated customers; and (c) publicly available information concerning Defendants. Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. This case arises from Defendants' exploitative implementation of their FDIC-Insured FlexInsured Sweep Account ("FlexInsured") and Insured Deposit Sweep Account ("IDSA") that Defendants used in Plaintiffs' accounts (collectively, the "Sweep Programs"), resulting in the breach of Defendants' contractual, fiduciary, and/or statutory obligations owed to Plaintiffs and similarly situated investors.

2. Defendants automatically "swept" uninvested cash balances in their customer accounts into interest-bearing deposit accounts at participating program banks ("Program Banks") selected by Defendants. The interest rates customers received through the Sweep Programs were substantially below prevailing market rates. As a result, Plaintiffs and Class members lost significant interest they would have otherwise earned had Defendants swept their cash into accounts or vehicles paying reasonable market rates or raised the rates paid to customers through the Sweep Programs as prevailing interest rates began to rise in 2022.

3. Cetera's FlexInsured Account Disclosure Statement, incorporated by reference into Sager's opening account document with CIS, provides that "[t]he interest rate available through the FlexInsured Account will be established periodically by Cetera Investment Services ***based on market, economic, and other business conditions***."[1] (Emphasis added.) Despite that provision, the rates paid

[1] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023), https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed November 6, 2026).

to customers enrolled in Cetera's Sweep Programs remained stagnant and bore no reasonable relation to prevailing market, economic, and other business conditions.

4. Cetera's IDSA Disclosure Statement, incorporated by reference into Peterson's opening account document with Cetera Advisors, similarly provides that "[t]he interest rate available through the IDSA program will be established periodically ***based on market, economic and other business conditions***."[2] (Emphasis added.) Despite that provision, the rates paid to customers enrolled in the IDSA, including Plaintiff Peterson, remained stagnant and bore no reasonable relation to prevailing market, economic, and other business conditions.

5. Instead of paying market rates during the Class Period, Defendants paid only between 0.03% and 0.25% to customers in the lowest tier in the FlexInsured program, and only approximately 0.40% to customers in the median tier in the FlexInsured program. Defendants have paid only approximately 0.40% in the IDSA program. Market rates on swept cash during this period have, by any reasonable measure, consistently exceeded 3.00%.

6. By failing to establish rates consistent with market, economic, and business conditions, Cetera breached its contractual obligations to Plaintiffs and Class members. Alternatively, by failing to select Program Banks that were willing to pay interest according to market, economic, and other business conditions, and/or by setting its fees under the Sweep Programs in a manner calculated to take advantage of customers, Cetera breached the implied covenant of good faith and fair dealing. Cetera's actions were also deceptive, unfair, and resulted in Cetera's unjust enrichment at the expense of its customers.

---

[2] Cetera Investment Services: Insured Deposit Sweep Account Disclosure Statement (August 2024), https://cdn.adviceworks.net/content/images/2024-08/PV-646.pdf?VersionId=66t0rHm_WD8vbJwV6vwAsF7bBU2QvcyP&contentId=D08001178 (last accessed October 27, 2026).

7. Indeed, during the rising interest rate environment from March 2022 through the present, the profits that Defendants have earned on their customers' cash have grown exponentially. Rising interest rates should have presented an opportunity for Defendants' customers to earn significantly more on their uninvested cash. However, Defendants continue to exploit this opportunity for their own benefit, extracting the interest rate spread for themselves and preventing their customers from receiving the market-based returns to which they were legally entitled. On top of that, Defendants disguise the returns they keep as "fees" for administering the Sweep Programs. However, in reality, Defendants receive kickbacks from the Program Banks on the profits they are able to obtain by investing or loaning out customers' cash at significantly higher rates of interest. By improperly keeping the interest rates paid on the cash sweep accounts low and sharing the interest profit with the Program Banks, Defendants align themselves with the banks to maximize their own profits, rather than with their customers.

8. This is not accidental: Defendants' own disclosures acknowledged that the Sweep Programs have been a source of substantial revenue and created conflicts of interest. For example, Defendants represent that "Cetera earns substantial fees from Program Banks based on your participation, and the fee will be significantly higher to Cetera than if your funds were swept into a money market mutual fund or deposited into another product or depository institution . . . The compensation that Cetera receives presents a conflict of interest, because Cetera receives a greater financial benefit when cash is swept into the FlexInsured Account than it otherwise would if your cash balance is held in a money market mutual fund or other products, and the fees that Cetera receives reduces the amount of interest you receive in the FlexInsured Account."[3]

---

[3] *Supra* n.1.

9. These disclosures are boilerplate and fail to alert customers to the nature and extent of Defendants' conduct. Defendants failed to adequately disclose the magnitude of the rate differential, the specific rates paid by the Program Banks, the specific amounts Defendants retained as compensation, or the true extent to which the Program enriched Defendants at their customers' expense.

10. Defendants' own disclosures also acknowledged that "rates of interest paid with respect to FlexInsured Accounts will generally be lower than the rate of return from a money market mutual fund."[4] Yet Defendants chose to designate their FDIC-Insured Program—not the higher-yielding money market fund alternative—as the default sweep option for eligible accounts, because, as Defendants admitted, they stood to earn more on the Program.[5]

11. While Cetera paid customers small amounts of interest, between 2023 and 2025, it earned over a 3% return on customer cash in fees—significantly more than its customers earned in interest.[6]

12. The Securities and Exchange Commission ("SEC") has specifically recognized that a "cash sweep program" is a "common source[] of conflicts of interest."[7] Despite this regulatory warning, Defendants exploited their discretion over the Program to maximize their own financial benefits at the direct expense of their customers.

---

[4] *Id.*

[5] *Id.*

[6] https://cetera.com/cetera-wealth-services/flexInsured-account-fees

[7] https://www.sec.gov/about/divisions-offices/division-trading-markets/broker-dealers/staff-bulletin-standards-conduct-broker-dealers-investment-advisers-conflicts-interest (last accessed November 6, 2026).

13. The Sweep Programs have been highly lucrative for Defendants. During the Class Period, the "spread" between the minuscule rates passed along to customers and the returns Defendants and the Program Banks earned from customer cash constituted a substantial and undisclosed profit center for Defendants.

14. Comparable brokerages paid substantially higher rates on swept cash. For example, Fidelity swept customers' cash into a money market mutual fund yielding as much as 5%, and Vanguard offered yields as high as 4.5%. By contrast, Defendants paid a tiny fraction of these market rates.

15. Other metrics—including the federal funds rate, Treasury bill yields, and money market fund returns—further evidence that Defendants' sweep rates were not based on market, economic, or business conditions.

16. Plaintiffs bring this action individually and on behalf of a Class of similarly situated individuals for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "ICFA"), violation of the California Unfair Competition Law ("UCL"), breach of fiduciary duty, and unjust enrichment, to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## **PARTIES**

17. At all times material hereto, Plaintiff Jennifer Sager has been a resident and citizen of the State of Illinois. Plaintiff Sager maintained a brokerage account with CIS. While Plaintiff Sager was Defendants' customer, the cash held in her account was automatically "swept" into the FlexInsured Account, a low interest-bearing sweep deposit account at a Program Bank.

18. At all times material hereto, Plaintiff Keith Peterson has been a resident and citizen of the State of Minnesota. Plaintiff Peterson maintained a brokerage account with Cetera Advisors.

Cetera Advisors also acted as his investment adviser. Cetera Advisors exercised trading discretion over Mr. Peterson's accounts and charged a fee for doing so. While Plaintiff Peterson was Defendants' customer, the cash held in his account was automatically "swept" into the Insured Deposit Sweep Account, a low interest-bearing sweep deposit account at a Program Bank.

19. Defendant Cetera Financial Group, Inc. is a Delaware corporation and the parent company and control person of its wholly owned subsidiary broker-dealers and registered investment advisers. Cetera Financial is headquartered in San Diego, California. Cetera Financial had ultimate authority over, and received direct financial benefit from, the Program. Through its network of independent broker-dealers and investment advisers, Cetera Financial controls the policies and practices at issue.

20. Defendant Cetera Investment Services LLC is a broker-dealer headquartered in Minnesota and a wholly owned subsidiary of Defendant Cetera Financial Group, Inc. CIS offers brokerage services to customers, including the administration and operation of the Program at issue.

21. Defendant Cetera Advisors LLC is a broker-dealer and former investment adviser headquartered in Colorado and a wholly owned subsidiary of Defendant Cetera Financial Group, Inc. Cetera Advisors offers brokerage services to customers, including the administration and operation of the Program at issue. Until the termination of its registration with the SEC in April 2024, Cetera Advisors acted as the investment adviser on Plaintiff Peterson's account.

22. Defendant Cetera Investment Advisers LLC is an investment adviser registered with the SEC, with its principal place of business in San Diego, California. CIA is the successor in interest to the investment advisory business of Cetera Advisors LLC and, following the consolidation of the two entities' operations, retained custody and control of Plaintiff Peterson's investment advisory account.

23. According to Cetera's website: "Cetera Financial Group (Cetera) is a network of independent retail firms, including FINRA/SIPC member firms Cetera Advisors LLC, Cetera Wealth Services, LLC (formerly known as Cetera Advisor Networks), Cetera Investment Services LLC (marketed as Cetera Financial Institutions or Cetera Investors), and Cetera Financial Specialists LLC. SEC-registered investment advisers include Cetera Investment Management LLC, Cetera Investment Advisers LLC, and Cetera Planning Partners within Cetera Holdings, an affiliate of Cetera. All referenced entities are under common ownership. Cetera's principal office is located at 655 W. Broadway, 11th Floor, San Diego, CA 92101."[8]

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class consists of at least 100 members, and (3) minimal diversity exists between at least one plaintiff or class member and one defendant.

25. This Court has personal jurisdiction over Defendants because they regularly conduct business and activities in this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

26. Venue is proper in this District under 28 U.S.C. §1391 because at least one of the Defendants resides in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendants' unlawful actions.

[8] https://cetera.com/ (last accessed October 27, 2026).

## FACTUAL BACKGROUND

### A. Defendants' Relationship with Customers

27. Plaintiffs and each Class member entered into an account agreement with CIS and Cetera Financial in connection with the opening and maintenance of their brokerage accounts. Plaintiff Peterson's account agreement also includes Cetera Advisors as a party. Each such agreement is referred to herein as the "Account Agreement" with Defendants with respect to the applicable Plaintiff or class member, and it outlines the contractual terms and conditions of Plaintiffs' relationship with each Defendant and applies to Plaintiffs' respective accounts.

28. The Account Agreement references and incorporates the terms and conditions of Defendants' Sweep Programs, including: (a) the FlexInsured Account Disclosure Statement; (b) the IDSA Disclosure Statement; and (c) CIS's Form CRS.[9]

29. Defendants' duties are further described in Regulation Best Interest ("Reg. BI") under the Securities Exchange Act of 1934, which requires broker-dealers to act in retail customers' best interests, meeting obligations of disclosure, care, conflicts of interest, and compliance.

30. Defendants failed to meet the obligations set forth in their disclosures and Reg. BI throughout the relevant Class Period as described below.

### B. The Cash Sweep Program

31. A "sweep program" is a "service provided by a broker-dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a

---

[9] These disclosures, together with any other documents that may apply to any of the parties or claims herein, as well as all amendments and successive versions thereof, are standard-form documents that, upon information and belief, Defendants drafted, maintained, and distributed to each of their accountholders as part of their ordinary course of business. Defendants are in the best position to produce these documents, which, if needed, may be obtained through discovery.

bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 C.F.R. § 240.15c3-3(a)(17).

32. Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the Net Interest Margin ("NIM").

33. The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers: Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep program[s]" are a "common source[ ] of conflicts of interest."[10]

34. Defendants maintained two primary sweep programs: the FlexInsured Account Program and the Insured Deposit Sweep Account Program. Under the Sweep Programs, and upon information and belief, Defendants automatically swept clients' available cash balances—including proceeds from securities sales, dividends, bond interest, and cash deposits—into interest-bearing deposit accounts at participating Program Banks.

35. The FlexInsured Account was the default sweep vehicle for most brokerage accounts and non-retirement advisory accounts, including Plaintiff Sager's account. Defendants chose this sweep vehicle over higher-yielding money market fund alternatives because, as they admitted, "[t]he Firm will earn more money by designating the FlexInsured Account . . . as the default sweep option for eligible accounts."

36. The IDSA was the default sweep vehicle for advisory IRAs, such as Plaintiff Peterson's account.

---

[10] *See supra* n.7.

37. The Sweep Programs primarily benefited Defendants at the expense of their customers. Through their operation of the Program, Defendants engaged in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers. Defendants admit that Cetera "has a financial incentive and conflict of interest in selecting cash sweep options."

### C. Defendants Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts

38. The FlexInsured Account Disclosure Statement represented that Defendants would pay Plaintiff Sager interest rates based on market, economic, and other business conditions. Cetera's FlexInsured Account Disclosure Statement provides:

> The interest rates accruing on your FlexInsured Account program balances are established periodically and fluctuate as frequently as daily without prior notice, ***based on market, economic, and other business conditions.*** (Emphasis added.)
>
> * * *
>
> The interest rate available through the FlexInsured Account will be established periodically by Cetera Investment Services ***based on market, economic, and other business conditions.*** (Emphasis added.)[11]

39. The Insured Deposit Sweep Account Disclosure Statement represented that Defendants would pay Plaintiff Peterson interest rates based on market, economic, and other business conditions. That disclosure provides:

> Interest rates will be established periodically and may fluctuate ***based on market, economic and other business conditions***. (Emphasis added.)
>
> * * *

---

[11] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023). https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed November 6, 2026)

> The interest rate available through the IDSA program will be established periodically ***based on market, economic and other business conditions***.[12]

40. Cetera did not pay rates in either of the Sweep Programs based on market, economic, or other business conditions. Instead, Cetera paid rates that were extremely low relative to benchmark rates.

41. This was intentionally self-serving. As Cetera admits:

> Cetera is responsible for setting the fees which ultimately reduces the interest rates available on FlexInsured Account deposits. Our Cash Sweep Governance Committee meets periodically to review the rates paid to customers who participate in the FlexInsured Account program based on a number of factors including the rates paid by Program Banks, interest rates paid by our competitors who offer similar insured deposit program, any expected changes in rates, and FlexInsured Account program expenses.[13]

42. Upon information and belief, Cetera chose affiliated banks that were willing to pay artificially and unreasonably low interest rates for deposit accounts in the Programs.

43. This is not by accident. The greater the amount of cash balances maintained under the Sweep Programs, and the lower the rates of interest (and/or higher fees) paid on these cash balances, the more Defendants benefit. Upon information and belief, based on these adverse incentives, Defendants limited customers to below-market interest rates and retained unreasonably high fees for themselves.

44. When interest rates rose in 2022, Defendants failed to take economic, market, and other business factors into account when setting customer sweep rates.

---

[12] Cetera Investment Services Insured Deposit Sweep Account Disclosure Statement (August 2024), https://cdn.adviceworks.net/content/images/2024-08/PV-646.pdf?VersionId=66t0rHm_WD8vbJwV6vwAsF7bBU2QvcyP&contentId=D08001178 (last accessed November 6, 2026).

[13] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023), https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed November 6, 2026)

45. Three-month Treasury bills rose in yield from 0.046% as of January 1, 2022, to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates for the vast majority of customers.

46. For example, below are the annual percentage yields paid in the FlexInsured program as of November 27, 2024[14] (at a time when the Federal Funds rate was approximately 4.58%):

FlexInsured Program Interest Rates (as of November 27, 2024)

| Tier | Range | Rate/Annual Percentage Yield |
|---|---|---|
| Tier 1 | $0 - $24,999 | 0.25% |
| Tier 2 | $25,000 - $49,999 | 0.25% |
| Tier 3 | $50,000 - $99,999 | 0.25% |
| Tier 4 | $100,000 - $249,999 | 0.35% |
| Tier 5 | $250,000 - $499,999 | 0.45% |
| Tier 6 | $500,000 - $749,999 | 0.50% |
| Tier 7 | $750,000 - $999,999 | 0.75% |
| Tier 8 | $1,000,000 - $1,499,999 | 1.00% |
| Tier 9 | $1,500,000 - $4,999,999 | 1.30% |
| Tier 10 | $5,000,000 - $9,999,999 | 1.50% |
| Tier 11 | $10,000,000 - above | 2.00% |

47. Below are the current FlexInsured Program interest rates (as of October 26, 2026),[15] while the Federal Funds rate is currently approximately 3.75%:

[14] https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30146201 (last accessed October 27, 2026)

[15] https://cetera.com/cetera-investment-services/disclosures/flexInsured-account (last accessed October 27, 2026)

FlexInsured Program Interest Rates (as of October 26, 2026)

| Tier | Range | Rate/Annual Percentage Yield |
| --- | --- | --- |
| Tier 1 | $0 - $24,999 | 0.03% |
| Tier 2 | $25,000 - $49,999 | 0.03% |
| Tier 3 | $50,000 - $99,999 | 0.03% |
| Tier 4 | $100,000 - $249,999 | 0.15% |
| Tier 5 | $250,000 - $499,999 | 0.25% |
| Tier 6 | $500,000 - $749,999 | 0.35% |
| Tier 7 | $750,000 - $999,999 | 0.45% |
| Tier 8 | $1,000,000 - $1,499,999 | 0.75% |
| Tier 9 | $1,500,000 - $4,999,999 | 1.30% |
| Tier 10 | $5,000,000 - $9,999,999 | 1.65% |
| Tier 11 | $10,000,000 - above | 2.05% |

48. The IDSA rate for all balance tiers was 0.35% as of October 4, 2024[16] and 0.45% as of September 22, 2026.[17]

49. Upon information and belief, instead of setting rates based on "market, economic, and other business conditions," Defendants actually set interest rates based on two factors: (1) their own profit motive, constrained only by (2) their customers' perceived rate sensitivity as informed by customers' assets under management. Defendants never disclosed that their actual practice was to set interest rates in this manner.

---

[16] https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30146266 (last accessed October 27, 2026)

[17] https://cetera.com/cetera-investment-services/disclosures/insured-deposit-sweep-account (last accessed October 27, 2026).

50. Setting rates based on "market, economic, and other business conditions" necessarily implies correlation to, and meaningful pass-through of, the Federal Funds benchmark rate. This is because "[t]he federal funds rate is the interest rate at which depository institutions trade federal funds (balances held at Federal Reserve Banks) with each other overnight. When a depository institution has surplus balances in its reserve account, it lends to other banks in need of larger balances. In simpler terms, a bank with excess cash, which is often referred to as liquidity, will lend to another bank that needs to quickly raise liquidity. . . . The effective federal funds rate is essentially determined by the market but is influenced by the Federal Reserve as it uses the Interest on Reserve Balances rate to steer the federal funds rate toward the target range." Consequently, "[t]he federal funds rate is the central interest rate in the U.S. financial market. It influences other interest rates such as the prime rate, which is the rate banks charge their customers with higher credit ratings. Additionally, the federal funds rate indirectly influences longer-term interest rates such as mortgages, loans, and savings, all of which are very important to consumer wealth and confidence."[18] As the Board of Governors of the U.S. Federal Reserve System ("Federal Reserve") explains on its website, "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."

51. Federal benchmark interest rates, including the federal funds rate ("FFR"), are therefore an appropriate point of comparison for whether Defendants paid rates based on "market, economic, and other business conditions."

52. The effective federal funds rate rose from a low of nearly zero to a 20-year high of approximately 5.33%, based on the Federal Reserve increasing the target range to 5.25% to 5.50%. For example, between March 16, 2022, and July 26, 2023, alone, the Federal Reserve announced eleven hikes to the federal funds rate, increasing it from a target range of 0.00% to 0.25% to a target

[18] https://fred.stlouisfed.org/series/FEDFUNDS (last accessed October 28, 2026).

range of 5.25% to 5.50%.[19] This was a fundamental change to market, economic, and other business conditions. Despite promising to consider such changes when setting the rates paid to customers under their Sweep Programs, Defendants failed to commensurately increase the amounts paid to customers and instead just pocketed more money.

53. Defendants have failed to pass through to their customers the increases in the FFR since at least early 2022. Between March 2022 and July 2023, the Federal Reserve increased the FFR target range eleven times. As a result, the FFR rose from approximately 1.58% (June 2022) to over 5.25% (June 2023 through mid-2024). In contrast, the rates paid under the Sweep Programs changed minimally—far below any market benchmark. The rates paid under the Sweep Programs consistently have been and remain unreasonably low and uncompetitive relative to FFRs, even during the ultra-low interest rate environment resulting from the COVID-19 pandemic (early 2020 through early 2022).

54. In addition to the federal funds rate, the rates paid under the Sweep Programs have been and remain ***significantly*** below several other objective benchmarks of reasonableness, including, by way of example: (a) U.S. Treasury bill rates; (b) the overnight interest rate at which the Federal Reserve sells securities and borrows cash from private banks (*i.e.*, the "repo" rate); and (c) the Secured Overnight Financing Rate ("SOFR"). Short-term interest rates for these other federal financial instruments experienced steep rate increases in 2022 and 2023, as the Federal Reserve hiked the federal funds rate.

55. For purposes of illustration, the following charts depict the one-year and three-month Treasury bill rates between 2017 and 2026:

---

[19] Federal Reserve, *Economy at a Glance – Policy Rate* (Jan. 30, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.







56. The repo rate similarly increased together with the federal funds rate beginning in 2022. For purposes of illustration, the following graph depicts the repo rates between 2017 and 2026:




57. As depicted above, like other short-term interest rate benchmarks, the repo rate increased alongside the federal funds rate beginning in 2022.

58. In addition, the rates paid under the Sweep Programs consistently have been and remain unreasonably low and uncompetitive relative to the SOFR.

59. The SOFR measures the cost of borrowing cash overnight collateralized by Treasury securities and is calculated from a very large volume of actual repurchase transactions.[20] It is widely regarded as the best measure of the marginal cost of secured overnight funding in U.S. dollar markets. Importantly, the SOFR is a market rate that Federal Reserve publications emphasize is the most representative measure of short-term funding conditions precisely because it is grounded in actual trades, rather than quotes or estimates.[21]

60. The sharp increases in the effective FFR and the SOFR beginning in 2022 and continuing through the present produced little to no increase in the rates paid under the Sweep

---

[20] Federal Reserve Bank of New York, *Secured Overnight Financing Rate*, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited November 6, 2026).

[21] Federal Reserve Bank of New York, *An Updated User's Guide to SOFR* (Feb. 2021), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf.

Programs. Indeed, the rates paid by Defendants remained far below market, even while short-term interest rate conditions improved drastically during the relevant time period. As shown above, in addition to the FFR, the rates paid under the Sweep Programs have been and remain significantly below several other objective indicia of reasonableness, including, by way of example: (a) SOFRs, including the 180-day average SOFR currently at 3.66%;[22] (b) Treasury bill rates, including the three-month and one-year rates currently at 3.97% and 4.16%, respectively, as of September 16, 2026;[23] and (c) the overnight repo rate, which is currently 3.50%, as of September 16, 2026.[24]

61. The sweep rates of some competitors were far greater than the paltry sums paid under Defendants' Sweep Programs. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program and Fidelity offered 5%.

62. At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, Defendants have been paying interest rates as low as 0.03%—virtually nothing.

63. The federal funds target rate continued to increase in 2023, hitting an effective yield of 5.33% on July 27, 2023. As the federal funds rate increased, so too did Vanguard and Fidelity

---

[22] SOFR Academy, *Market Data*, https://sofracademy.com/current-sofr-rates/ (last visited November 6, 2026).

[23] Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (September 16, 2026), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (September 16, 2026), https://fred.stlouisfed.org/series/DTB1YR.

[24] Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate* (July 30, 2026), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

continue to increase the rates they paid on swept cash. Defendants, by contrast, continued to pay close to no interest.

64. While every cash sweep program is unique, the disparity in yield between Defendants' Sweep Programs and those of Defendants' competitors illustrates that Defendants operated the Program to serve their own interests rather than the interests of their customers. Defendants chose Program Banks in order to maximize their own profits and thereby failed to ensure that their customers would be paid rates based on "market, economic, and other business conditions."

65. Competitor sweep programs are governed by different contractual arrangements and business structures, many of which may also involve structural, rate-depressing conflicts of interest. Nevertheless, sweep rates offered by other financial institutions highlight the uncompetitiveness and unreasonableness of Defendants' Sweep Programs, and demonstrate that Defendants stand out among the worst in the industry.

66. Fidelity also offers to automatically sweep customers' cash into a money market mutual fund with a current seven-day yield of 3.33%, as of August 31, 2026. Vanguard offers to automatically sweep customers' cash into one of five money market mutual funds with current seven-day yields ranging from 2.59% to 3.71%.

67. Like Fidelity and Vanguard, Defendants could have automatically swept cash to banks that pay market rates, or allowed all customers to sweep to a money market mutual fund. Money market mutual funds are strictly regulated by the SEC and can only be sold pursuant to prospectuses, which disclose the sponsor's profits on the use of investor cash. By contrast, Defendants' Program does not disclose the significant spread between the rates paid on cash and the FFR or rates paid by other competitors.

68. Not only are Cetera's interest rates significantly lower than its competitors', but they are also substantially lower than interest rates for money market funds. Nevertheless, Cetera

automatically places customers into the cash sweep program developed with low yield rates that it negotiated with partner banks.

69. The disclosures for both of the Programs advised customers that they would "generally" receive lower rates in the Programs than if their money were placed in a money market fund. This statement has been false, because Defendants have chosen Program Banks and/or set rates in a manner that ***guarantees*** that customers will necessarily receive ***dramatically*** lower rates than they would in an equivalent-risk money market fund.

**D. Cetera Advisors breached its fiduciary duties to investment advisory clients.**

70. Cetera Advisors and its successor CIA offered investment advisory services to individual clients, including Plaintiff Peterson. Cetera Advisors was registered as an investment adviser with the SEC in order to offer investment advisory products and services to its advisory clients.

71. Under the Investment Advisers Act of 1940 (the "Advisers Act" or the "1940 Act"), Cetera Advisors and CIA owed fiduciary duties to Plaintiff Peterson and the proposed Advisory Subclass.

72. Cetera Advisors managed investment advisory accounts on a discretionary basis, which are subject to the IDSA program. In providing discretionary advisory services, Cetera Advisors and CIA made the decision regarding the purchase or sale of investments without the client's approval as to each transaction.

73. Investment advisers such as Cetera Advisors and its successor CIA were fiduciaries under the 1940 Act during the relevant period.[25]

---

[25] *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also* Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act

74. The investment adviser's fiduciary duty "is broad and applies to the entire adviser-client relationship." This fiduciary duty is "based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id*. at *2.

75. The fiduciary duty an investment adviser owes to its client under the 1940 Act specifically encompasses a duty of care and duty of loyalty. As the SEC has stated, "[t]his means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at *3.

76. Under an investment adviser's duty of loyalty, "an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.* at *3, 8.[26]

77. The investment adviser's duty of care includes, among other things: "(i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship." *Id.* at *4.

---

Release No. 5248, 2019 WL 3779889, at *1 (June 5, 2019) ("Under federal law, an investment adviser is a fiduciary.").

[26] However, in certain situations disclosure is simply not sufficient, and "[f]or retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable." Where an investment adviser such as Cetera Advisors "cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent," then it "should either *eliminat*e the conflict or adequately *mitigate* (i.e., modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible." *Id*. at *9 (emphasis in original).

78. By paying significantly lower rates for the cash sweep programs in which they automatically placed Plaintiff Peterson and Advisory Subclass members, Cetera Advisors and its successor CIA did not act in their clients' best interests. Instead, Cetera Advisors and CIA put Cetera's own interests above their clients', making substantial interest revenue at their customers' expense. In so doing, Cetera Advisors and CIA breached their fiduciary duties to advisory clients like Mr. Peterson.

79. The IDSA Program was not operated in the manner Defendants described or in a manner consistent with Defendants' fiduciary obligations. Defendants state in their Form CRS: "When we provide you with a recommendation as your broker-dealer or act as your investment adviser, we have to act in your best interest and not place our interest ahead of yours."[27] By paying clients below-market interest rates and extracting unreasonable compensation for themselves, Cetera Advisors and CIA failed to act in their clients' best interests and placed Cetera's own financial interests ahead of their clients' interests.

80. Cetera Advisors and its successor CIA rendered investment advice regarding Plaintiff Peterson's and Advisory Subclass members' cash by automatically defaulting their advisory accounts into the IDSA Program and thereafter directing their uninvested cash into deposit accounts at Program Banks. In providing that advice, Cetera Advisors and CIA were obligated to consider reasonably available alternatives—including higher-yielding money market funds—and to recommend the option that was in their clients' best interest, not the option that generated the most revenue for Defendants.

---

[27] https://cdn.adviceworks.net/content/images/2025-10/PV-697_10_25_secured.pdf?VersionId=HLKnKJgFAEfvqJf.AosIAM_GMH48iPWl&contentId=D08005873 (last accessed November 6, 2026)

81. Although Defendants acknowledged in general terms that the IDSA Program created a conflict of interest, Cetera Advisors and CIA failed to make full and fair disclosure of the material facts necessary for their advisory clients to give informed consent, including the amount and rate of fees Defendants retained, the spread between what Program Banks paid and what clients received, the impact of that spread on client returns, and the availability of higher-yielding alternatives. Nor did Cetera Advisors and its successor CIA eliminate or mitigate the conflict; instead, they managed the conflict for their own benefit rather than in their clients' best interests.

82. Cetera Advisors and CIA compounded the breach by charging Plaintiff Peterson and Advisory Subclass members asset-based advisory fees on the very cash they swept into the IDSA Program to earn near-zero interest, further enriching Cetera at their clients' expense.

83. Defendants' conduct continued after Cetera Advisors was consolidated into CIA in 2024, and its advisory clients, including Plaintiff Peterson and the Advisory Subclass, were transferred to CIA.[28] Upon information and belief, the consolidation did not change the operation of the IDSA Program. Plaintiff Peterson's and Advisory Subclass members' accounts continued to be swept into the IDSA Program, earn suppressed, below-market interest, and generate spreads retained by Defendants. Thus, the alleged fiduciary breaches and resulting damages continued uninterrupted after the consolidation.

**E. Cetera maximized its profits from the cash sweep program by systematically prohibiting its financial professionals from offering customers higher-yielding alternatives to the Program.**

84. Defendants had alternatives for cash management, including other sweep vehicles, that would have paid customers a competitive market rate of interest. For example, one of those potential alternative vehicles would have been enrollment into higher-yielding money market funds.

---

[28] https://cetera.com/press-room/consolidation-advisory-business (last accessed November 6, 2026).

85. Defendants explicitly admit that "[y]ou may receive a lower rate of return on funds deposited through the FlexInsured Account than other types of money market investments such as money market funds."[29]

86. Yet, despite acknowledging that rates paid under the Program were lower than rates that may be available through money market funds, Defendants consciously steered Plaintiffs and similarly situated investors into the lower-yielding Program for their own financial benefit. As Defendants explained:

> Cetera Investment Services earns substantial fees from Program Banks based on your participation in the FlexInsured Account program, and this fee will be significantly higher to Cetera Investment Services than if your funds were swept tointo *[sic]* a money market mutual fund or deposited in another product or depository institution . . . This compensation that Cetera Investment Services receives presents a conflict of interest to Cetera Investment Services because Cetera Investment Services receives a greater financial benefit when cash is swept into the FlexInsured Account than it otherwise would if your cash is held in a money market fund or other products . . . Cetera Investment Services therefore has an incentive for your funds to be swept into the FlexInsured Account program rather than a money market mutual funds or other alternative to the FlexInsured Account.[30]

87. Although Defendants disclosed this financial incentive, they did not disclose that their policies and practices restricted financial professionals from offering money market funds to customers as an alternative to the Sweep Programs.

88. Indeed, Defendants represented that "[i]f you elect not to utilize the FlexInsured Account as the sweep option on your account, your Financial Professional can tell you about certain money market funds or other products available through Cetera Investment Services that you may

---

[29] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023). https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed November 6, 2026)

[30] *Id.*

wish to consider as alternative to maintaining cash deposits on your account."[31] Yet, upon information and belief, Defendants maintained a policy that restricted their financial professionals[32] from offering money market funds to customers as an alternative to the cash sweep program.

89. Instead, the only actual alternative to the Sweep Programs that Defendants disclosed was leaving cash in the brokerage account, where it earned no interest at all.[33]

90. Upon information and belief, the "alternative" Defendants touted was therefore illusory. By representing that money market funds were available through their financial professionals while prohibiting those same professionals from offering them, Defendants left customers with only two options: the Sweep Programs' below-market rates or no interest at all. This served Defendants' financial interests at their customers' expense. In this way, Defendants ensured that customer cash remained captive in the Sweep Programs, where it generated substantial profits for Defendants. This was far more beneficial to Defendants than the alternative of having that cash swept to higher-yielding alternatives that would have benefited customers while earning Defendants little or nothing.

**F. Cetera Financial's Control Over and Participation in the Program**

91. Upon information and belief, Cetera Financial directly participated in and exercised control or oversight over material aspects of the Program.

92. CIS is, and at all relevant times was, a wholly owned subsidiary of Cetera Financial. Cetera Financial owns all equity interests in CIS, and CIS has no shareholders or equity owners

---

[31] *Id.*

[32] This term includes both registered representatives providing broker-dealer services and investment adviser representatives providing fee-based advisory services.

[33] Cetera Investment Services FlexInsured Account Disclosure Statement (October 2023), at 3, https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30051160 (last accessed November 6, 2026).

independent of Cetera Financial. CIS's own financial materials describe CIS as a "wholly owned subsidiary of Cetera Financial Group, Inc."[34]

93. CIS's FINRA BrokerCheck report likewise identifies Cetera Financial as its "SOLE MEMBER," with an ownership percentage of "75% or more." More distinctly, CIS expressly states "yes" to FINRA's question whether Cetera Financial "directs the management or policies" of CIS.[35] This same filing also reflects that Cetera Financial's C-suite officers hold officer positions at CIS. *Id.*

94. Cetera Financial's connection to the Program extends beyond its ownership of CIS. Cetera Financial is also the registered owner of the federal trademark for "FLEXINSURED ACCOUNT," the name under which the Program is offered.[36]

95. CIS's SEC-filed audited financial statements further reflect an ongoing operational and financial relationship between CIS and Cetera Financial. Among other things, CIS discloses that Cetera Financial allocates a portion of its general administrative expenses to CIS based on factors including CIS's total revenues, assets under management, sales volume, number of personnel, and producing advisors.[37] Thus, Cetera Financial is not merely a passive shareholder of CIS.

96. Upon information and belief, material aspects of the Program—including the methodology for determining customer rates, bank economics, revenue allocation, and customer disclosures—were established, approved, ratified, and/or overseen by Cetera Financial, including through individuals who held positions at both Cetera Financial and CIS.

---

[34] https://myceterasmartworks.com/Public/Portal/Content.aspx?ContentId=30144889 (last visited November 6, 2026).

[35] https://files.brokercheck.finra.org/firm/firm_15340.pdf (last visited September 20, 2026).

[36] https://trademarks.justia.com/775/32/flexinsured-77532815.html (last visited September 20, 2026).

[37] https://www.sec.gov/Archives/edgar/data/718856/000071885626000005/cwspub.pdf (last visited September 20, 2026).

97. Upon information and belief, in implementing and administering the Program, CIS acted, at least in part, pursuant to the direction, approval, or oversight of Cetera Financial and acted as Cetera Financial's agent with respect to the conduct alleged herein.

98. Accordingly, Cetera Financial is liable for its own participation in and control over the conduct alleged herein and, to the extent CIS acted as its agent, for CIS's conduct within the scope of that agency.

99. Upon information and belief, Cetera Financial also failed to exercise reasonable care in its oversight of the Program, including with respect to rate governance, conflicts, customer disclosures, and supervisory review.

## CLASS ALLEGATIONS

100. Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of themselves and all others similarly situated defined as follows:

101. **The Class** is defined as follows:

> All Cetera customers who had cash deposits or balances in Cetera's Sweep Programs during the applicable limitations period.

102. **The Illinois Subclass** is defined as follows:

> All Cetera customers who reside in Illinois who had cash deposits or balances in Cetera's Sweep Programs during the applicable limitations period.

103. **The Advisory Subclass** is defined as follows:

> All Cetera advisory customers who had cash deposits or balances in Defendants' IDSA Program during the applicable limitations period.

104. Unless otherwise specified, all references herein to the "Class" shall include the Class, the Illinois Subclass, and the Advisory Subclass. Plaintiffs reserve the right to modify, expand, or otherwise amend the Class and Subclass definitions, including by adding or removing subclasses, as discovery and further investigation may warrant and as may be appropriate or permitted under Fed. R. Civ. P. 23.

105. **Numerosity.** Upon information and belief, there are thousands of Class members, so joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number in the thousands and are geographically dispersed because Defendants oversee billions in client assets worldwide.

106. **Commonality.** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a) whether Defendants breached their contract with Plaintiffs and the putative Class members regarding the Programs, including the implied covenant of good faith and fair dealing;

(b) whether Defendants made material misrepresentations and/or omissions in connection with the Programs;

(c) whether Defendants have been unjustly enriched because of the conduct complained of herein;

(d) whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

(e) whether Defendants owed fiduciary duties to advisory clients in connection with their Programs;

(f) to what extent Class members are entitled to damages and other monetary relief; and

(g) to what extent Class members are entitled to attorneys' fees and costs.

107. **Typicality**. Plaintiffs' claims are typical of the claims of the Class because they were customers of Defendants who had their cash balances improperly managed by Defendants through their administration of the Programs. Thus, Plaintiffs' claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, and the relief sought

within the Class is common to the members of each.

108. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

109. **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiffs and putative Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

110. **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT – FLEXINSURED PROGRAM
## (On behalf of Plaintiff Sager and the Class Against CIS and Cetera Financial)

111. Plaintiff Sager repeats, realleges, and incorporates the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

112. Plaintiff Sager's and Class members' relationship with CIS and Cetera Financial is

governed by an Account Agreement, the terms of which are contained in, and incorporated into, various standardized documents drafted by Cetera, including the FlexInsured Program disclosures. As alleged above, Cetera Financial owns and controls CIS and, upon information and belief, participated in and exercised control or oversight over material aspects of the FlexInsured Program giving rise to the breaches alleged herein.

113. The interest rates paid under the FlexInsured Program were not established based on market, economic, and other business conditions. Instead, CIS and Cetera Financial maintained rates far below prevailing market rates even as short-term interest rates increased substantially, thereby increasing the compensation CIS and Cetera Financial earned from the FlexInsured Program at their customers' expense.

114. The contract included the following contractual terms, among others: interest rates on the deposit accounts will be established periodically by CIS based on market, economic, and other business conditions; and CIS and Cetera Financial are responsible for setting the fees which ultimately reduce the interest rates available on the deposit accounts.

115. Moreover, CIS and Cetera Financial failed to extract market-based, reasonable fees from the FlexInsured Program. Because the FlexInsured Program was to be a market-based investment that utilized customer cash, and customer returns were to be dictated by participating Program Banks and the prevailing short-term, market interest rate environment, the fees taken from that amount were required to be market-based and reasonable, reflecting the true value of the intermediary services CIS and Cetera Financial actually performed, not their own economic interests.

116. Plaintiff Sager and Class members fulfilled all the terms and obligations of their contracts, including paying commissions and fees for CIS and Cetera Financial's services.

117. CIS and Cetera Financial undertook to act as agents of the customers regarding all transactions relating to the FlexInsured Program and were thus contractually obligated to obtain for

Plaintiff Sager and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their clients' best interests.

118. As set forth herein, the rates of return paid to customers on their cash balances were not reasonable and CIS and Cetera Financial did not act in their clients' best interests. Accordingly, CIS and Cetera Financial breached their contracts with Plaintiff Sager and the members of the proposed Class.

119. CIS and Cetera Financial breached their contractual obligations as described herein by, among other things: (a) failing to provide Plaintiff Sager and the Class with reasonable, market-based interest rates on their deposits in the FlexInsured Program; (b) failing to adjust the interest rates paid to customers based on market, economic, and other business conditions when federal interest rates began to rise in 2022; and (c) extracting unreasonable fees from the interest accrued on the deposit accounts that were not based on the market value of the intermediary services they provided. Indeed, the sweep interest rates provided by CIS and Cetera Financial were unreasonably low and well below several objective benchmarks including the FFR, which increased dramatically during the relevant time period while the interest rates paid to customers in the FlexInsured Program lagged far behind and remained well below market. As such, CIS and Cetera Financial denied Plaintiff Sager and the Class the full benefit of their bargain under the FlexInsured Program disclosures.

120. Plaintiff Sager and the members of the proposed Class suffered monetary damages because of CIS and Cetera Financial's breach of contract.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – FLEXINSURED PROGRAM
**(On behalf of Plaintiff Sager and the Class Against CIS and Cetera Financial)**

121. Plaintiff Sager repeats, realleges, and incorporates the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

122. A covenant of good faith and fair dealing is implied into every contract, including the

Account Agreement.

123. Plaintiff Sager and Class members contracted with CIS and Cetera Financial to provide them with brokerage services pursuant to the Account Agreement and related disclosures. As alleged above, Cetera Financial owns and controls CIS, and upon information and belief, participated in and exercised control or oversight over the material aspects of the FlexInsured Program challenged herein, including CIS's exercise of discretion concerning the FlexInsured Program.

124. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties, both explicit and implied, and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.

125. CIS and Cetera Financial's conduct breached the covenant of good faith and fair dealing implied in their agreements with Plaintiff Sager and the Class. To the extent those agreements afforded CIS and Cetera Financial discretion over the sweep options made available to customers, CIS and Cetera Financial were obligated to exercise that discretion in good faith and consistent with customers' reasonable expectations. Instead, CIS and Cetera Financial exercised it to enrich themselves, holding out alternatives that their own policy foreclosed and thereby depriving Plaintiff Sager and the Class of the benefit of their bargain.

126. CIS and Cetera Financial both operated the FlexInsured Program in bad faith and in a manner that evaded the spirit of the FlexInsured Program and denied Plaintiff Sager and the Class the expected benefit of their bargain.

127. Among other things, CIS and Cetera Financial used their discretion over the FlexInsured Program—including discretion over the selection of Program Banks, the placement of customer cash, the sweep rates, and the fees retained by CIS and Cetera Financial—to credit customers unreasonably low, stagnant sweep interest rates while retaining, diverting, or allocating to

themselves unreasonable portions of the economic value generated by customers' cash. Those credited rates were far below objective benchmarks, including the federal funds rate, Treasury and repo rates, competitor sweep rates, and money market fund yields, even as those benchmarks rose dramatically. CIS failed to move sweep rates upward during the period from approximately March 2022 through the present, during which the Federal Funds Rate rose from near-zero to as high as 5.33%—a period in which virtually every other interest-bearing product available to retail customers increased materially in yield.

128. By operating the FlexInsured Program in this manner, CIS and Cetera Financial acted opportunistically and in bad faith, frustrated customers' reasonable expectations, and deprived customers of the principal benefit of the FlexInsured Program and the full benefit of their bargain. Plaintiff Sager and the Class reasonably expected to earn interest on uninvested cash pending deployment into investments, but CIS's arbitrary rate-setting made this purpose illusory by diverting virtually all interest income to itself.

129. CIS and Cetera Financial further breached the implied covenant through their handling of alternatives to the FlexInsured Program. Although the FlexInsured Program disclosures represented that customers could learn from their Financial Professionals about available money market funds and other products, CIS maintained a policy prohibiting its Financial Professionals from offering money market funds as an alternative to the FlexInsured Program.

130. By holding out an alternative that their own policy foreclosed, CIS and Cetera Financial exercised their discretion over available sweep options to keep customer cash in the FlexInsured Program and maximize the fees they received from Program Banks. This conduct frustrated Plaintiff Sager's and Class members' reasonable expectations and deprived them of the benefit of their bargain.

131. As such, CIS and Cetera Financial acted in bad faith and for their own financial benefit

rather than for the purposes contemplated by the FlexInsured Program disclosures. In doing so, CIS and Cetera Financial denied Plaintiff Sager and the Class the full benefit of their bargain under the FlexInsured Program disclosures, and frustrated their objectively reasonable contractual expectations.

132. CIS and Cetera Financial exercised their contractual discretion to maintain artificially low and below-market sweep rates while retaining the substantial economic value generated by customer cash, even as short-term, market interest rates and comparable cash sweep programs increased significantly.

133. No rational business rationale—other than diverting maximum interest income from customers to CIS and Cetera Financial—explains the decision to maintain near-zero sweep rates during a rising rate environment, and this decision was therefore arbitrary and in bad faith.

134. Plaintiff Sager and Class members fulfilled all the terms and obligations of their contracts, including paying commissions and fees for CIS and Cetera Financial's services.

135. As a result of CIS and Cetera Financial's breach of the implied covenant of good faith and fair dealing, Plaintiff Sager and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT – IDSA
## (On behalf of Plaintiff Peterson and the Class Against All Defendants)

136. Plaintiff Peterson repeats, realleges, and incorporates the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

137. Plaintiff Peterson's and Class members' relationship with Defendants is governed by the Account Agreement, the terms of which are contained in, and incorporated into, the Insured Deposit Sweep Account Disclosure Statement governing the IDSA. As alleged above, Cetera Advisors, CIS, and Cetera Financial each participated in and exercised control or oversight over the material aspects of the IDSA giving rise to the breaches alleged herein.

138. The interest rates paid under the IDSA were not established based on market, economic, and other business conditions, did not vary with prevailing market rates, and were not reasonable. Instead, Defendants maintained rates far below prevailing market rates even as short-term interest rates increased substantially, thereby increasing the compensation Defendants earned from the IDSA at their customers' expense.

139. With respect to the IDSA, the disclosure statement expressly provided that "[t]he interest rate available through the IDSA program will be established periodically based on market, economic and other business conditions." Contrary to that term, the interest rates paid to Plaintiff Peterson and Class members under the IDSA were not established based on market, economic, and other business conditions. Those rates did not vary reasonably with prevailing market rates and remained far below prevailing market rates even as short-term interest rates rose substantially.

140. Moreover, Defendants failed to extract market-based, reasonable fees from the IDSA. Because the IDSA was to be a market-based investment that utilized customer cash, and customer returns were to be dictated by participating Program Banks and the prevailing short-term, market interest rate environment, the fees taken from that amount were required to be market-based and reasonable, reflecting the true value of the intermediary services Defendants actually performed, not their own economic interests.

141. Plaintiff Peterson and Class members fulfilled all the terms and obligations of their contracts, including paying commissions and fees for Defendants' services.

142. Defendants undertook to act as agents of the customers regarding all transactions relating to the IDSA and were thus contractually obligated to obtain for Plaintiff Peterson and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their clients' best interests.

143. As set forth herein, the rates of return paid to customers on their cash balances were

not reasonable and Defendants did not act in their clients' best interests. Accordingly, Defendants breached their contracts with Plaintiff Peterson and the members of the proposed Class.

144. Defendants breached their contractual obligations as described herein by, among other things: failing to adjust the interest rates paid to customers based on market, economic, and other business conditions when federal interest rates began to rise in 2022. Indeed, the sweep interest rates provided by Defendants were unreasonably low and well below several objective benchmarks including the FFR, which increased dramatically during the relevant time period while the interest rates paid to customers in the IDSA lagged far behind and remained well below market. As such, Defendants denied Plaintiff Peterson and the Class the full benefit of their bargain under the IDSA disclosures.

145. Defendants further breached the Account Agreement by designating the IDSA as the default sweep vehicle for advisory IRAs, including Plaintiff Peterson's account, and then paying IDSA participants unreasonably low, below-market rates while retaining for themselves the economic value generated by those customers' cash.

146. Plaintiff Peterson and the members of the proposed Class suffered monetary damages because of Defendants' breach of contract.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – IDSA
## (On behalf of Plaintiff Peterson and the Class Against All Defendants)

147. Plaintiff Peterson repeats, realleges, and incorporates the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

148. A covenant of good faith and fair dealing is implied into every contract, including the Account Agreement.

149. Plaintiff Peterson and Class members contracted with Defendants to provide them with brokerage services pursuant to the agreements and related disclosures. As alleged above, Cetera

Financial owns and controls CIS and Cetera Advisors, and upon information and belief, participated in and exercised control or oversight over the material aspects of the IDSA challenged herein, including CIS's exercise of discretion concerning the IDSA.

150. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties, both explicit and implied, and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.

151. Defendants' conduct breached the covenant of good faith and fair dealing implied in their agreements with Plaintiff Peterson and the Class. To the extent those agreements afforded Defendants discretion over the sweep options made available to customers, Defendants were obligated to exercise that discretion in good faith and consistent with customers' reasonable expectations. Instead, Defendants exercised it to enrich themselves, holding out alternatives that their own policy foreclosed and thereby depriving Plaintiff Peterson and the Class of the benefit of their bargain.

152. Defendants both operated the IDSA in bad faith and in a manner that evaded the spirit of the IDSA and denied Plaintiff Peterson and the Class the expected benefit of their bargain.

153. Among other things, Defendants used their discretion over the IDSA—including discretion over the selection of Program Banks, the placement of customer cash, the sweep rates, and the fees retained by Defendants—to credit customers unreasonably low, stagnant sweep interest rates while retaining, diverting, or allocating to themselves unreasonable portions of the economic value generated by customers' cash. Those credited rates were far below objective benchmarks, including the federal funds rate, Treasury and repo rates, competitor sweep rates, and money market fund yields, even as those benchmarks rose dramatically. CIS failed to move sweep rates upward during the period from approximately March 2022 through the present, during which the Federal Funds Rate rose from

near-zero to as high as 5.33% — a period in which virtually every other interest-bearing product available to retail customers increased materially in yield.

154. Defendants exercised the same discretion in bad faith with respect to the IDSA. Although the IDSA disclosures conferred on CIS the discretion to establish the IDSA interest rate "periodically," Defendants used that discretion to keep IDSA rates artificially low. They did so even though the cash swept into the IDSA came from advisory IRAs, whose owners Defendants knew were relying on Defendants, as their investment adviser and broker, to manage that cash in their interest. Plaintiff Peterson and Class members reasonably expected that the IDSA rate would be set based on market, economic, and other business conditions, not based on Defendants' desire to maximize their own revenue.

155. By operating the IDSA in this manner, Defendants acted opportunistically and in bad faith, frustrated customers' reasonable expectations, and deprived customers of the principal benefit of the IDSA and the full benefit of their bargain. Plaintiff Peterson and the Class reasonably expected to earn interest on uninvested cash pending deployment into investments, but CIS's arbitrary rate-setting made this purpose illusory by diverting virtually all interest income to itself.

156. Defendants further breached the implied covenant through their handling of alternatives to the IDSA. Although the IDSA disclosures represented that customers could learn from their Financial Professionals about available money market funds and other products, CIS maintained a policy prohibiting its Financial Professionals from offering money market funds as an alternative to the IDSA.

157. By holding out an alternative that their own policy foreclosed, Defendants exercised their discretion over available sweep options to keep customer cash in the IDSA and maximize the fees they received from Program Banks. This conduct frustrated Plaintiff Peterson's and Class members' reasonable expectations and deprived them of the benefit of their bargain.

158. As such, Defendants acted in bad faith and for their own financial benefit rather than for the purposes contemplated by the IDSA disclosures. In doing so, Defendants denied Plaintiff Peterson and the Class the full benefit of their bargain under the IDSA disclosures, and frustrated their objectively reasonable contractual expectations.

159. Defendants exercised their contractual discretion to maintain artificially low and below-market sweep rates while retaining the substantial economic value generated by customer cash, even as short-term, market interest rates and comparable cash sweep programs increased significantly.

160. No rational business rationale—other than diverting maximum interest income from customers to Defendants—explains the decision to maintain near-zero sweep rates during a rising rate environment, and this decision was therefore arbitrary and in bad faith.

161. Plaintiff Peterson and Class members fulfilled all the terms and obligations of their contracts, including paying commissions and fees for Defendants' services.

162. As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff Peterson and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION AND OMISSIONS
## (On behalf of Plaintiffs and the Class Against All Defendants)

163. Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

164. Defendants were the agents of customers enrolled in the Sweep Programs, including Plaintiffs and the Class.

165. Cetera Financial is directly liable for the misrepresentations and omissions alleged herein.

166. Defendants negligently made material misrepresentations and omissions concerning

the Programs, as detailed above. Among other things, the Program disclosures stated that the interest rate earned by clients "will generally be lower than interest rates available to depositors in interest-bearing accounts held directly at a Program Bank or other FDIC-insured depository institutions,"[38] without disclosing the magnitude of the differential or the specific compensation retained by Defendants.

167. In reality, contrary to Defendants' misrepresentations and omissions, Defendants unilaterally decided to pay below-market, unreasonably low interest rates to customers, which remained stagnant despite a dramatically rising interest rate environment, and to extract unreasonably high compensation for themselves. Additionally, the Program disclosures failed to disclose the specific rates the Program Banks were paying, the proportion of such payments that Defendants were retaining as fees, or the extent to which Defendants were profiting from the Programs.

168. The Insured Deposit Sweep Account Disclosure Statement was materially misleading in the same respects. It represented that IDSA interest rates would be established based on market, economic, and other business conditions. However, it did not disclose that Defendants would in fact pay IDSA participants rates far below prevailing market rates. Nor did it disclose the rates Program Banks paid on IDSA deposits or the portion of those payments Defendants retained. Plaintiff Peterson and Advisory Subclass members justifiably relied on these representations and omissions in leaving their cash in the IDSA.

169. Defendants failed to disclose their actual interest rate setting practice, which differed from the practice described in the Program disclosures.

170. Defendants further represented that, if a customer elected not to use the FlexInsured Account, a Financial Professional would be able to inform them about alternative cash management

---

[38] *Supra* n.1.

options, including potentially higher-yielding money market funds. That statement was false when made: Defendants had adopted a blanket policy prohibiting their financial professionals from offering money market funds as an alternative to the Programs. Defendants likewise omitted the existence of that policy, a fact material to any customer deciding whether to leave cash in the Programs.

171. Defendants knew or should have known that the representation was false and the omission misleading, because Defendants both authored the Program disclosures and issued the policy that contradicted them. Had Plaintiffs and the Class known that money market funds were not in fact available to them through their Financial Professionals, they would have sought higher-yielding alternatives for their uninvested cash rather than leaving it in the Programs.

172. Moreover, Cetera Financial knew or should have known that this representation was false because, upon information and belief, it adopted or approved the policy that contradicted it. Cetera Financial supplied this information to guide customers' decisions about their uninvested cash and had a direct pecuniary interest in those decisions. It failed to exercise reasonable care, including through the oversight failures alleged herein.

173. Plaintiffs and the Class justifiably relied on Defendants' misrepresentations and omissions and accordingly deposited and maintained cash balances in the Programs to their detriment.

174. Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiffs and the members of the Class.

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
**(On behalf of Plaintiff Sager and the Illinois Subclass Against All Defendants)**

175. Plaintiff Sager repeats, realleges, and incorporates the allegations in Paragraphs 1-110 by reference as if fully set forth herein.

176. The ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the

concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

177. Defendants' acts and practices with respect to the Programs constitute unfair and deceptive acts and practices in the conduct of trade and commerce in violation of the ICFA.

178. Defendants' acts and practices with respect to the Programs occurred in the course of trade or commerce within the meaning of the ICFA because the account agreements and Program disclosures are standardized form documents offered on a nationwide basis to Defendants' brokerage clients, including Plaintiff Sager and members of the Illinois Subclass.

179. Defendants' acts and practices with respect to the Programs were materially deceptive because the Program disclosures did not accurately reflect the way that Defendants operated the Programs or the full extent of the financial benefit Defendants derived at customers' expense.

180. In reality, Defendants unilaterally decided to pay below-market, unreasonably low interest rates to customers, which remained stagnant despite a dramatically rising interest rate environment, and extract unreasonably high compensation for themselves. Additionally, Defendants failed to disclose the specific rates the Program Banks were paying or the proportion of such payments that Defendants were retaining.

181. Defendants' acts and practices with respect to the Programs were also unfair within the meaning of the ICFA because they (a) offend the public policy of the State of Illinois favoring honest dealing in financial services and the protection of retail investors; (b) are immoral, unethical, oppressive, and unscrupulous in that Defendants exploited their control over customer cash to enrich themselves at the direct expense of their customers; and (c) caused substantial injury to consumers that consumers themselves could not reasonably avoid, given that the Programs were the default sweep vehicles and customers were not offered competing options at account opening.

182. Defendants intended that Plaintiff Sager and members of the Illinois Subclass rely on Defendants' deceptive disclosures and omissions concerning the Programs.

183. Defendants' acts and practices with respect to the Programs caused Plaintiff Sager and members of the Illinois Subclass to suffer actual damages, including the difference between the interest they received under the Programs and the interest they would have received at reasonable market rates.

184. Defendants' acts and practices were further deceptive because the Program disclosures represented that customers who declined the FlexInsured Account could obtain money market funds and other products through their Financial Professional, when Defendants had adopted a blanket policy prohibiting their financial professionals from offering money market funds as an alternative to the FlexInsured Account. Defendants thereby misrepresented, and concealed the true state of, the alternatives available to Illinois consumers for their uninvested cash.

185. Defendants' concealment of that policy was material because it bore directly on whether Plaintiff Sager and members of the Illinois Subclass would leave their cash in the Programs or move it to a higher-yielding vehicle. Defendants intended that consumers rely on the false assurance that alternatives were available, and the practice was also unfair because it deprived consumers of any meaningful ability to avoid the Programs' below-market rates while serving no purpose other than increasing the fees Defendants earned from Program Banks.

186. Accordingly, Plaintiff Sager and members of the Illinois Subclass seek all available relief under the ICFA, including actual damages, punitive damages, attorneys' fees and costs pursuant to 815 ILCS 505/10a, and injunctive relief.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(On behalf of Plaintiffs and the Class Against All Defendants)**

187. Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–110 by

reference as if fully set forth herein.

188. Plaintiffs assert this cause of action against Defendants for unlawful, unfair and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL").

189. Defendants are under common ownership and are headquartered in California, such that their conduct alleged herein emanated from California.

190. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable. Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful," "unfair," and "fraudulent" business acts or practices within the meaning of the UCL.

191. Defendants have violated the UCL's proscription against engaging in "unlawful" conduct by virtue of violating the laws in other counts mentioned herein.

192. Defendants' conduct is "fraudulent" because Defendants' affirmative misstatements and/or omissions alleged herein are likely to deceive a reasonable consumer.

193. Defendants' conduct is "unfair" because its utility, if any, is greatly outweighed by the harm it causes to Plaintiffs and the Class; and because it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; and because it violates established public policy as alleged herein.

194. As a direct and proximate result of Defendants' violations of the UCL, Plaintiffs and the Class suffered an injury in fact and have suffered monetary harm. Defendants, on the other hand, have been unjustly enriched. The Court should require Defendants to make restitution to Plaintiffs and the Class and/or disgorge their ill-gotten profits pursuant to Cal. Bus. & Prof. Code § 17203.

195. Defendants' unlawful, unfair, and fraudulent business practices, as described herein, present a continuing threat to Plaintiffs and the general public in that Defendants' deceptive conduct

is ongoing. Plaintiffs further seek an order enjoining Defendants from engaging in any unlawful or inequitable acts and practices as alleged herein.

196. Plaintiffs and the Class seek equitable relief because they have no other adequate remedy at law. Legal remedies available to Plaintiffs and Class Members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different from the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs and Class Members failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money the defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the statutes herein entail few elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiffs seek equitable remedies, in the alternative to legal remedies which are as of yet uncertain.

197. Legal remedies available to Plaintiffs and Class Members are inadequate because they do not address likely future harms. As of the date of this filing, Defendants continue to operate the Sweep Programs as alleged herein. If Defendants are not enjoined from continuing to operate in this manner, Defendants will continue to injure Plaintiffs and Class Members through the misconduct alleged herein.

**EIGHTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class Against All Defendants)**

198. Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

199. This cause of action is pled in the alternative to the extent it is determined there is no enforceable contract against one or any of the Defendants.

200. Because of Defendants' wrongful conduct as alleged herein, Plaintiffs and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

201. Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiffs and Class members in the form of increased compensation and revenue that belonged to Plaintiffs and Class members.

202. Defendants were likewise unjustly enriched through the IDSA. By paying Plaintiff Peterson and Advisory Subclass members unreasonably low, below-market rates on cash swept from their advisory IRAs into the IDSA, Defendants retained compensation and revenue that, in equity, belonged to those customers. Defendants also charged asset-based advisory fees on the same cash.

203. Defendants financially benefited from the unlawful acts alleged herein by paying Plaintiffs and the Class unreasonably low and below-market interest payments under the Programs while retaining substantial compensation for themselves. These unlawful acts caused Plaintiffs and the Class to suffer injury and monetary loss.

204. Moreover, Cetera Financial received and retained a benefit at Plaintiffs' and Class members' expense. Cetera Financial allocates its general administrative expenses to CIS based in part on CIS's revenues, including the Programs' revenues generated from customer cash, which funded Cetera Financial's own operations. Upon information and belief, the Programs' revenues also flowed

to Cetera Financial.

205. It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

206. Plaintiffs and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiff Peterson and the Advisory Subclass Against Cetera Advisors and CIA)**

207. Plaintiff Peterson repeats, realleges, and incorporates the allegations in Paragraphs 1–110 by reference as if fully set forth herein.

208. As fiduciaries to Plaintiff Peterson and the Advisory Subclass, Cetera Advisors and CIA owed them the highest duties of loyalty, candor, due care, and prudence in the services they provided in connection with establishing, maintaining, and/or operating the IDSA Program. Moreover, as fiduciaries, Cetera Advisors and CIA had a continuing duty to act exclusively for the benefit of Plaintiff Peterson and the Advisory Subclass in connection with the IDSA Program. Cetera Advisors and CIA also had a continuing duty to obtain informed consent from Plaintiff Peterson and the Advisory Subclass regarding the IDSA Program, and specifically to make sufficiently detailed disclosures regarding the IDSA Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

209. Cetera Advisors and CIA further owed Plaintiff Peterson and the Advisory Subclass the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the IDSA Program.

210. Cetera Advisors and CIA further owed Plaintiff Peterson and the Advisory Subclass the duty to charge reasonable fees for their services related to the IDSA Program.

211. Plaintiff Peterson and the Advisory Subclass were fully dependent upon Cetera

Advisors' and CIA's ability, skill, knowledge, and goodwill with respect to the IDSA Program.

212. Cetera Advisors and CIA breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the IDSA Program to benefit Cetera at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the IDSA Program, violating their duty of care, and acting in Cetera's—not their customers'—best interest.

213. Cetera Advisors and CIA also violated their duty to deal fairly and honestly with Plaintiff Peterson and the Advisory Subclass by making material misrepresentations and omissions regarding the IDSA Program, and violated their duty to act with reasonable care to verify the truthfulness of the information set forth in their disclosures concerning the IDSA Program, which were materially misleading and omitted material facts for the reasons described herein.

214. As a direct and proximate consequence of Cetera Advisors' and CIA's conduct as alleged herein, Plaintiff Peterson and the Advisory Subclass suffered damages in an amount to be determined at trial and seek disgorgement of any unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiffs as class representatives and their counsel as class counsel;
2. Awarding Plaintiffs all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;
3. Awarding Plaintiffs and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiffs' reasonable attorneys' fees, costs, and other litigation expenses;
5. Awarding pre- and post-judgment interest, as allowable by law;
6. For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;
7. Declaratory and equitable relief, including restitution and disgorgement;
8. For public injunctive relief as the Court may deem proper; and
9. Awarding such further and other relief as the Court deems just, proper and equitable.

**JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: November 6, 2026

Respectfully submitted,

By: */s/ Scott Edelsberg*

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar No. 330990)
Gabriel Mandler (*pro hac vice* to be filed)
Omer Kremer (*pro hac vice* to be filed)
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com
gabriel@edelsberglaw.com
omer@edelsberglaw.com

Jason T. Dennett (*pro hac vice*)
**MILBERG PLLC**
1700 7th Avenue, Suite 2100
Seattle, WA 98101
Telephone: (516) 515-9124
jdennett@milberg.com

Philip M. Black (SBN 308619)
**MILBERG PLLC**
280 S. Beverly Dr., Penthouse
Beverly Hills, CA 90212
Telephone: 747-213-4622
pblack@milberg.com

*Counsel for Plaintiffs and the Proposed Class*